AO 91 (REV.5/85) Criminal Complaint                                      AUSA SAM COLE, (312) 353-4258

# UNITED STATES DISTRICT COURT

## NORTHERN _____ DISTRICT OF ILLINOIS, EASTERN DIVISION

| UNITED STATES OF AMERICA | **CRIMINAL COMPLAINT** |
| | **UNDER SEAL** |
| v. | **MAGISTRATE JUDGE COX** |
| | **CASE NUMBER:** |
| CARLOS GORDON | |

**FILED**
6·27·08
JUN 27 2008  NB

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**08 CR 517**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about June 24, 2008 in ___Will___ County, in the ___Northern___ District of ___Illinois___ , and elsewhere, defendant(s) did,

knowingly and intentionally possess with intent to distribute a controlled substance, namely, 50 grams or more of mixtures containing cocaine base in the form of "crack cocaine," a Schedule II Narcotic Drug Controlled Substance,

in violation of Title ___21___ United States Code, Section 841(a)(1).

I further state that I am a Special Agent, Drug Enforcement Administration ___ and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof: __x__ Yes _____ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

June 27, 2008
Date

at Chicago, Illinois
City and State

Hon. Susan E. Cox, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, David Brazao, having been duly sworn, state as follows:

1.    I am a Special Agent with the United States Drug Enforcement Administration, Chicago Field Division, where I have worked since 1999. Prior to my employment with the DEA, I worked for the U.S. Border Patrol starting in 1996. I am currently assigned to Enforcement Group 22, where my responsibilities include investigating violations of federal and state narcotics laws.

2.    The information contained in this affidavit is based upon my own observations and discussions that I have had with other individuals – both law enforcement and non-law enforcement – as well as my training and experience. The following summary of certain facts is submitted for the limited purpose of establishing probable cause in connection with the complaint to which this affidavit is attached. I have set forth only the facts that I believe are necessary to establish probable cause in this matter. This is not a complete statement of all that I know about Carlos GORDON or the events described in this affidavit. The telephone calls summarized below were in English and all monitored by me or other law enforcement personnel. The descriptions below are not intended to be verbatim transcripts.

3.    On or about June 24, 2008, I and other law enforcement personnel were contacted by a Cooperating Source of Information (herein referred to as CS). The CS told agents that Daniel RODRIGUEZ distributes large amounts of crack cocaine and powder cocaine through out the Chicagoland area. The CS further stated that he/she could purchase six and one half ounces of crack cocaine from RODRIGUEZ. The CS stated that he/she had conversations with RODRIGUEZ about cocaine and crack cocaine transactions. The CS is scheduled to report next month to serve two concurrent 25-month federal sentences (that had already been reduced for prior cooperation) based

on drug trafficking and firearms convictions. The CS is cooperating in the hope of receiving an additional sentencing reduction. The CS has two prior convictions for battery.

4.      On or about June 24, 2008, at approximately 1:54 p.m., under the direction of law enforcement personnel, the CS placed a recorded telephone call to RODRIGUEZ to arrange the purchase of six and one half ounces of crack cocaine. During the conversation, the CS told RODRIGUEZ that he/she needed four and a half ounces for one customer and another two ounces for another customer. RODRIGUEZ told the CS that he had to contact his source of supply (SOS) and would call the CS back.

5.      At approximately 2:39 p.m., the CS was contacted by RODRIGUEZ. In a recorded conversation, RODRIGUEZ told the CS that his SOS was not answering his phone because he was in school. RODRIGUEZ assured the CS that his SOS had the crack cocaine and would deliver it around 6:00 p.m. The CS told RODRIGUEZ that the money would be ready.

6.      At approximately 2:54 p.m., RODRIGUEZ contacted the CS. In a recorded conversation, RODRIGUEZ told the CS that the SOS called and he (SOS) had the cocaine. RODRIGUEZ further told the CS that he was meeting the SOS in forty-five minutes and then he (RODRIGUEZ) would be on his way to meet the CS. The CS told RODRIGUEZ that he/she would be ready with the money.

7.      At approximately 3:05 p.m., RODRIGUEZ contacted the CS but the call failed. The CS then returned RODRIGUEZ's call. In a recorded conversation, RODRIGUEZ asked the CS if he/she wanted it "hard." The CS understood this to mean that RODRIGUEZ was going to cook powder cocaine into crack cocaine (cocaine base). The CS told RODRIGUEZ that he wanted "crack" and RODRIGUEZ said O.K.; he just wanted to make sure.

8.    At approximately 4:50 p.m., the CS contacted RODRIGUEZ.  In a recorded conversation, RODRIGUEZ stated that his SOS was on his way.  RODRIGUEZ asked the CS how much he/she was charging for the crack that he/she sold and the CS said $900 per ounce. RODRIGUEZ told the CS that he (RODRIGUEZ) would be there by 6:00 p.m.  RODRIGUEZ further stated that the SOS was shot in the finger on the highway and people were after the SOS' family.

9.    At approximately 5:40 p.m., law enforcement officers established surveillance on the CS at the White Castle restaurant, Route 53 and Briarcliff Road, Bolingbrook, Illinois.  The CS drove with a DEA undercover agent (UC) in the UC's official undercover vehicle.  Additionally, the CS was searched for weapons and contraband that yielded negative results and was equipped with a recording device.

10.    At approximately 6:00 p.m., RODRIGUEZ and a second individual, later identified as Carlos GORDON, arrived at the White Castle in RODRIGUEZ's vehicle.  The CS met with RODRIGUEZ and GORDON, who had a cast on his arm, inside the White Castle restaurant. During that meeting, which was recorded, RODRIGUEZ told the CS that he had it (referring to the crack) and they all exited the restaurant.  The CS, RODRIGUEZ and GORDON then entered RODRIGUEZ's vehicle.  The CS stated that, while in the vehicle, GORDON told the CS, "It's exactly on."  The CS understood this to mean that the crack cocaine weight was correct.

11.    At approximately 6:10 p.m., law enforcement officers arrested RODRIGUEZ and GORDON.  On the back seat of RODRIGUEZ's car, agents found a brown paper bag containing a clear plastic bag, which in turn contained several large chunks of suspected crack cocaine.  A field test was positive for cocaine.  The cocaine weighed approximately 182 grams.  Based on the

3

appearance of the drugs, the context of the investigation as a whole, my experience, and the experience of the other agents involved in the case, I believe the substance is crack cocaine.

12.     At approximately 6:50 p.m., SA Brazao read RODRIGUEZ his Miranda warnings. RODRIGUEZ stated that he understood his rights and signed a Miranda waiver form. RODRIGUEZ then informed agents that he knew he was being investigated. He further stated, among other things, that he knew what he was getting into and he got caught. RODRIGUEZ then stated words to the effect that if you are going to play, you have to pay.

13.     At approximately 6:55 p.m., law enforcement officers interviewed GORDON. GORDON was read his Miranda warnings and stated that he understood his rights. GORDON voluntarily signed a Miranda form and agreed to cooperate with agents.

14.    GORDON stated that at approximately 11:00 a.m., he was contacted by RODRIGUEZ and RODRIGUEZ asked for a four and two. GORDON understood this to mean six ounces of crack cocaine. GORDON stated, among other things, that he then called an individual only known to him by his first name and ordered six and one half ounces of cocaine. GORDON stated that he purchased four ounces of cocaine from this person for $3500 but that the person only had four ounces of cocaine and would deliver the rest the next day. GORDON stated that at approximately 5:00 p.m., RODRIGUEZ picked him (GORDON) up at his girlfriend's house and they went to Bolingbrook, Illinois, together.

FURTHER AFFIANT SAYETH NOT.

David Brazao
Special Agent
U.S. Drug Enforcement Administration

Signed and Sworn before me
This 27th day of June, 2008.

Susan E. Cox
United States Magistrate Judge

5